# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

JONATHAN R., *et al.*,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

PATRICK MORRISEY, *et al.*,

*Defendants-Appellees/Cross-Appellants.*

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 3:19-cv-00710 (Goodwin, J.)

## REPLY BRIEF OF DEFENDANTS-APPELLEES/CROSS-APPELLANTS

JOHN B. MCCUSKEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
  *Solicitor General*
  *Counsel of Record*

HOLLY J. WILSON
  *Principal Deputy Solicitor*
  *General*

CALEB B. DAVID
  *Deputy Solicitor General*

FRANKIE A. DAME
  *Assistant Solicitor General*

Counsel for Defendants-Appellees/Cross-Appellants

# TABLE OF CONTENTS

Table of Authorities ................................................................ ii

Introduction ......................................................................... 1

Argument ............................................................................ 3

I.   The district court erred in finding commonality ................... 3

    A.   No offending policy or practice applies uniformly ........... 5

        1.   Disparate policy deviations in a decentralized system don't generate common questions ........................... 5

        2.   Disparate causes don't provide a common question redressable by a single injunction ........................ 8

        3.   Plaintiffs' expert evidence suffers the same defect as the expert in *Wal-Mart* ................................ 11

    B.   Plaintiffs fail to rehabilitate their not-so-common practices ....... 12

        1.   Caseloads ..................................................... 14

        2.   Array of placements ......................................... 15

        3.   Case planning ................................................ 20

        4.   Community-based services .................................. 23

II.  The district court erred in finding typicality .................... 24

III. The district court erred in finding that a single injunction or declaratory judgment would provide relief to all .................... 28

Conclusion ......................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of
Homeland Sec.,*
No. 07-cv-8224, 2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012) ........................ 16

*Allen v. Cnty. Sch. Bd.,*
249 F.2d 462 (4th Cir. 1957) ................................................................ 29

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) ................................................................ 19

*Boley v. Brown,*
10 F.3d 218 (4th Cir.1993) .................................................................. 25

*Boley v. Universal Health Servs., Inc.,*
36 F.4th 124 (3d Cir. 2022) ................................................................. 25

*Briggs v. Elliott,*
132 F. Supp. 776 (E.D.S.C. 1955) ......................................................... 29

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
155 F.3d 331 (4th Cir.1998) ................................................................ 25

*Brown v. Bd. of Educ.,*
139 F. Supp. 468 (D. Kan. 1955) .......................................................... 29

*Brown v. Electrolux Home Prods., Inc.,*
817 F.3d 1225 (11th Cir. 2016) ............................................................. 1

*Brunson v. Bd. of Trs. of Sch. Dist. No. 1 of Clarendon Cnty.,*
311 F.2d 107 (4th Cir. 1962) ............................................................... 29

*Career Counseling, Inc. v. AmeriFactors Fin. Grp.,*
91 F.4th 202 (4th Cir. 2024) ................................................................ 1

*Carter v. City of Montgomery,*
108 F.4th 1334 (11th Cir. 2024) ........................................................... 24

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998) ............................................................... 15, 26, 27

*In re Countrywide Fin. Corp. Mortg. Lending Pracs. Litig.,*
708 F.3d 704 (6th Cir. 2013) ................................................................ 7

*Deiter v. Microsoft Corp.,*
436 F.3d 461 (4th Cir. 2006)..................................................24, 25

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez,*
431 U.S. 395 (1977)........................................................................31

*EEOC v. Freeman,*
778 F.3d 463 (4th Cir. 2015)..........................................................12

*Elizabeth M. v. Montenez,*
458 F.3d 779 (8th Cir. 2006)......................................................26, 27

*G.T. v. Bd. of Educ.,*
117 F.4th 193 (4th Cir. 2024) ................................8, 18, 21, 22

*Georgine v. Amchem Prods., Inc.,*
83 F.3d 610 (3d Cir. 1996) ............................................................26

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.,*
594 U.S. 113 (2021).....................................................................1, 13

*King v. UA Loc. 91,*
No. 2:19-CV-01115-KOB,
2020 WL 4003019 (N.D. Ala. July 15, 2020)................................10

*In re Lamictal Direct Purchaser Antitrust Litig.,*
957 F.3d 184 (3d Cir. 2020) ...........................................................15

*M.D. ex rel. Stukenberg v. Perry,*
675 F.3d 832 (5th Cir. 2012)..........................................................10

*Parent/Prof'l Advoc. League v. City of Springfield,*
934 F.3d 13 (1st Cir. 2019) ..............................................................8

*Ross v. Lockheed Martin Corp.,*
267 F. Supp. 3d 174 (D.D.C. 2017) ...............................................10

*S. Indep. Bank v. Fred's, Inc.,*
No. 2:15-CV-799-WKW,
2019 WL 1179396 (M.D. Ala. Mar. 13, 2019) .........................15, 16

*Stafford v. Bojangles' Rests., Inc.,*
123 F.4th 671 (4th Cir. 2024) ......................................................1, 2

*United States v. Caporale,*
701 F.3d 128 (4th Cir. 2012)..........................................................16

iii

*United States v. Wooden,*
   693 F.3d 440 (4th Cir. 2012)................................................................14

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)..............4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 28, 29, 30, 31

*Youngberg v. Romeo,*
   457 U.S. 307 (1982)................................................................30

## Statutes

Civil Rights Act of 1964 Title VII ........................................................30

W. VA. CODE § 49-4-404 ........................................................7, 21, 22

W. VA. CODE § 49-4-610 ........................................................21

## Other Authorities

*Child Welfare Dashboard: Our Key Performance Indicators,* W.
   VA. DEP'T OF HUMAN SERVS., https://tinyurl.com/4ea7pw4d
   (last visited July 29, 2025)................................................................7

# INTRODUCTION

"[T]he class-action mechanism is a carefully constructed compromise in our legal system—one which Article III courts play a critical role in maintaining." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 683 (4th Cir. 2024). By policing Rule 23's requirements, courts ensure that they won't become "bogged down unknotting unnecessarily disparate claims." *Id.* Loosening those requirements could also undermine public confidence in class actions' fairness—or worse, impede the class's right to obtain relief and the defendants' right to secure due process. Altogether, when it comes to Rule 23, "[w]ith great power comes great responsibility." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) (cleaned up).

Plaintiffs ask this Court to abdicate its role and responsibility. They wave the Court away from anything approaching a close look at the evidence. Still, courts must conduct a "rigorous analysis" to confirm that a plaintiff has supplied "evidence" that "demonstrate[s] compliance with Rule 23." *Career Counseling, Inc. v. AmeriFactors Fin. Grp.*, 91 F.4th 202, 206 (4th Cir. 2024). Plaintiffs also dismiss issues that touch on the merits. Yet courts must probe the evidence purportedly supporting class certification "even when that requires inquiry into the merits." *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,

594 U.S. 113, 122 (2021). And Plaintiffs fault the State Defendants for searching for some specificity in Plaintiffs' contentions. But "[a]llegations of generalized policies," like those turning on "systemic failures'" or "systemic deficiencies," are "not usually sufficient for the purposes of class certification." *Stafford*, 123 F.4th at 680.

Much of Plaintiffs' response amounts to a heated attack on distorted versions of Defendants' arguments, buttressed by insistences that courts have sometimes certified foster-care-related class actions. But as before (Resp. Br. 2), rhetoric is not enough to build a viable case (or class). And while courts have sometimes certified foster-care-related class actions, the question now is only whether *this* record justified class certification for *these* Plaintiffs and *this* class. Especially considering the ever-evolving and disparate nature of Plaintiffs' claims, the answer is "no."

Make no mistake: Plaintiffs' circumstances are deeply sympathetic, and the State Defendants recognize the challenges they face in ensuring foster children receive the care they deserve. Yet entangling all of West Virginia's foster children in a sprawling class action won't serve their interests. So if the Court decides to reverse the district court's dismissal, it should reverse the class certification, too.

# ARGUMENT

As a bipartisan group of 16 States said, the broad class here "ignore[s] the widely different circumstances of foster children, lumping them together" in a way that's "at odds with key class action requirements."  States' Amicus Br. 17.  Plaintiffs' response confirms the same.  The class lacks a common question driving resolution of its claims, typical named plaintiffs, and a means through which an injunction could provide genuine relief.

## I. The district court erred in finding commonality.

Plaintiffs' problems begin with a lack of any common questions.  It's hard to show commonality without defining the alleged injury.  Plaintiffs rely on a broad conception of a substantive due process right to be free from a "risk of harm."  Even after Defendants noted how Plaintiffs haven't identified some more specific "harm," Resp. Br. 56-57, Plaintiffs still declined to do so.

Unable to identify a concrete common injury, Plaintiffs keep shifting theories.  Placement stability data shows West Virginia is a nationwide leader—so Plaintiffs now claim it's a bad thing; children are said to be stuck in placements that are unsafe or unsuitable.  Reply Br. 46.  But they offer no evidence.  And a slow track to permanency isn't an issue anymore, as the evidence shows West Virginia achieves permanency at a faster clip than most

States.  So Plaintiffs then hedge and suggest the real issue with case planning is the lack of undefined "services" and "safe and stable homes."  Reply Br. 48.

This continued evolution—even on appeal—shows why the district court abused its discretion in turning generalities into common questions.  And it shows why class treatment is inappropriate.  Foster children—like all children—are unique.  They are placed in the State's custody for unique reasons.  They require services tailored to their unique needs.  The State meets those unique needs through the discretionary work of hundreds of caseworkers and thousands of multidisciplinary teams, who create individualized case plans, and dozens of circuit court judges, who approve them.

Plaintiffs' individualized harms stem from varying causes.  No two children are the same; no two case plans are the same; no two problems are caused by the same reason.  So their individualized concerns can't be redressed in one stroke.  Absent an "official policy" or "well-defined practice" causing *all* foster children to suffer the "same injury," no "single injunction" can redress their alleged injuries.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 358 (2011).  So commonality cannot be found.

### A. No offending policy or practice applies uniformly.

Plaintiffs don't argue that the State Defendants have any official policy that violates their substantive due process rights. Reply Br. 40-41. DHS's "official policy" is memorialized in statute and its Foster Care Policy. And "Plaintiffs admit that West Virginia laws and policies governing case planning are consistent with federal law." JA1455.

Left without any affirmative policy, Plaintiffs claim that Defendants engage in a practice of "substantial deviations from official rules and norms." Reply Br. 40. But Plaintiffs never identify these allegedly widespread (and common) "deviations" or their prevalence. Nor do they explain the cause of the irregular departures. Each of these failures warrants decertification.

### 1. Disparate policy deviations in a decentralized system don't generate common questions.

The system of discretion being challenged here doesn't offer a common question—just start with *Wal-Mart* to see why. There, female employees alleged sex discrimination in pay and promotion decisions across the country. *Wal-Mart*, 564 U.S. at 342-43. One plaintiff alleged she was paid less than her male colleagues and disciplined for things they were not. *Id.* at 344. Another claimed her male manager yelled at females (but not at males) and made demeaning comments. *Id.* Another claimed she was passed over for

management training because she was a woman. *Id.* All three worked at different stores and had different supervisors. *Id.* They didn't allege that Wal-Mart had an "express corporate policy against the advancement of women." *Id.* They alleged instead that their "local managers' discretion over pay and promotions [was] exercised disproportionately in favor of men." *Id.* In other words, they claimed that certain employees deviated from Wal-Mart's "announced policy forbid[ding] sex discrimination." *Id.* at 353.

But the Supreme Court rejected the *Wal-Mart* plaintiffs' efforts to fashion commonality from inconsistency. It didn't find that the alleged offending managers were innocent; it recognized "managers may be guilty of intentional discrimination that produces a sex-based disparity." *Wal-Mart*, 564 U.S. at 355. But "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id.* at 355-56. So the plaintiffs were "unable to show" that the class claims "depend on the answers to common questions." *Id.* at 356. *Wal-Mart* "is clear: class members must unite acts of discretion under a single policy or practice, or through a single mode of exercising discretion, and the mere presence of a range within which acts of discretion take place will not suffice to establish

commonality." *In re Countrywide Fin. Corp. Mortg. Lending Pracs. Litig.*, 708 F.3d 704, 708 (6th Cir. 2013).

This case suffers from the same defect that the putative *Wal-Mart* class action did, as inconsistent, *ad hoc* deviations on the part of some caseworkers are the most Plaintiffs have alleged. Plaintiffs claim *some* of Defendants' employees have deviated from "rules." And they claim *some* have deviated from "norms." And they label those deviations "systemic practices." Reply Br. 41. But the label doesn't change the substance. Like Wal-Mart, West Virginia's foster care system operates through a decentralized structure. It has twenty-nine districts, JA1378, staffed by nearly a thousand caseworkers, *Child Welfare Dashboard: Our Key Performance Indicators*, W. VA. DEP'T OF HUMAN SERVS., https://tinyurl.com/4ea7pw4d (last visited July 29, 2025). Those caseworkers collaborate within multidisciplinary teams to develop "an individualized service plan for a child or family," W. VA. CODE § 49-4-404(a), for thousands of children. The case plans are then filed with dozens of judges, who review them and "determine if implementation of the plan is in the child's best interests." *Id.*

Showing that one caseworker's proposed case plan is invalid will not show another plan is. Showing that one caseworker was lax in doing his job

will say nothing about another. And so on. Plaintiffs are thus "unable to show" that the class claims "depend on the answers to common questions." *Wal-Mart*, 564 U.S. at 356. Plaintiffs' claims are instead "based on multiple, disparate failures to comply with [DHS's] statutory obligations rather than a policy or practice which affects them all." *G.T. v. Bd. of Educ.*, 117 F.4th 193, 206 (4th Cir. 2024). Employees' diverse departures don't form a policy. *See, e.g.*, *Parent/Prof'l Advoc. League v. City of Springfield*, 934 F.3d 13, 28 (1st Cir. 2019) (stating that systemic claims "challenge an identifiable, uniform system-wide policy enforced at the highest administrative level") (cleaned up). Quite the opposite: the alleged "common" departures aren't common at all. Even saying that some departures result in a "risk of harm" doesn't resolve that discontinuity. *See G.T.*, 117 F.4th at 209 (finding no commonality where "individual claims of harm stem from different alleged policy failures").

### 2. Disparate causes don't provide a common question redressable by a single injunction.

Relatedly, the policy deviations must be redressable in a "single injunction." *Wal-Mart*, 564 U.S. at 360. In other words, it's not enough to say that a policy is ignored; it must be ignored in the same way. Otherwise, "each individual class member would be entitled to a *different* injunction." *Id.*

*Wal-Mart* again offers the right place to start. There, an injunction requiring the company to discipline male and female employees the same way might satisfy the first plaintiff. *Wal-Mart*, 564 U.S. at 344. But it does nothing to remedy another supervisor's preference for male employees in management training. *Id.* And it wouldn't affect those managers who "would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all." *Id.* at 355. "[C]laims must depend upon a common contention—for example, the assertion of a discriminatory bias on the part of the same supervisor … of such a nature that it is capable of classwide resolution." *Id.* at 350.

These same principles apply to West Virginia's foster care system. A Wyoming County child may not be placed in a family home because her family is unwilling to accept a child with her behavioral health needs. Another Berkeley County child may not be placed in a family home because a caseworker is overwhelmed due to a co-worker going on maternity leave. In Kanawha County, a third child's placement may be delayed because of a scheduling snafu with the circuit court. Setting aside that these hypotheticals don't demonstrate anything systemic, the departures also happened for diverse reasons.

As these hypotheticals show, a "single injunction" can't redress Plaintiffs' injuries, as the "nature" of the claims is unique. "In other words, if the merits of each class member's substantive due process claims depend on an individualized inquiry regarding the harm or risk of harm experienced by each class member from the State's practices, then dissimilarities within the proposed class would appear to prevent the class claims from asserting a common question of law that will resolve an issue that is central to the validity of each one of the claims in one stroke." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843 (5th Cir. 2012) (cleaned up). That's exactly what plays out here. And because the reasons for alleged deficiencies are caused by individualized, case-specific issues rather than "[system]-wide, objective, and *de jure* policies implemented by high-level decisionmakers," *King v. UA Loc. 91*, No. 2:19-CV-01115-KOB, 2020 WL 4003019, at *12 (N.D. Ala. July 15, 2020), Plaintiffs' disparate claims would require "*different* injunction[s]" to redress their alleged harms, *Wal-Mart*, 564 U.S. at 360. That's why "*Wal-Mart* teaches … that plaintiffs can maintain" a class action only if they can offer a system-wide "'common contention' regarding the *reasons* that each member of the class has suffered an injury." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 197

(D.D.C. 2017) (Jackson, J.) (emphasis added).  The reasons here lack that commonality.

### 3. Plaintiffs' expert evidence suffers the same defect as the expert in *Wal-Mart*.

Even if the alleged disparate policy departures could form a common claim (which they cannot), Plaintiffs lack "significant proof" that DHS "operated under a general policy" of offering an inadequate array of placements, failing to engage in appropriate case planning, maintaining high caseloads, or providing an inadequate infrastructure of therapeutic service providers.  *Wal-Mart*, 564 U.S. at 353.

Return for a third time to *Wal-Mart*.  There, the plaintiffs relied on their expert's opinion that Wal-Mart had a "strong corporate culture" that made it "vulnerable to gender bias" to establish a "general policy of discrimination." 564 U.S. at 353-54 (cleaned up).  But the expert "could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking."  *Id.* at 354 (citation omitted). "[C]ommonality depend[ed]" on this "essential question."  *Id.*  And because the expert couldn't say how prevalent discrimination was, the Court could "safely disregard what he ha[d] to say."  *Id.* at 354-55.

11

Plaintiffs' evidence suffers the same defect here. Plaintiffs' primary experts limited their opinions to the nine case records they reviewed. One said she looked at "the nine cases" because "[t]hat is what [they] were asked to look at." JA1004-1005. Another said she didn't evaluate whether the three cases she looked at had common issues with all foster children in West Virginia because she didn't "have access to that kind of information." JA1040. Still another conceded that her understanding of the availability of services in West Virginia "is only to the extent that [she] reviewed case records and could see what happened and what didn't happen with the kids [they] reviewed." JA1061-1062. So Plaintiffs' experts, like the expert in *Wal-Mart*, can't say how prevalent any of the alleged "common practices" are. And their testimony cherry-picks nine cases from thousands. *See, e.g., EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting authorities showing how "courts have consistently excluded expert testimony that 'cherry-picks' relevant data"). A court must disregard it.

## B. Plaintiffs fail to rehabilitate their not-so-common practices.

Plaintiffs don't do much to try to show that the district court conducted a rigorous analysis. Instead, they say Defendants have conceded the case away by not referencing the clear-error standard each time evidence is

mentioned.  Reply Br. 41, 43-45, 47, 50-51, 54; *but see* Resp. Br. 25 (acknowledging the clear error standard for factual findings).  They also insist that problematic evidence goes only to "weight," Reply Br. 36, 43-44, or the "merits," Reply Br. 43, 50, 53.  The district court made a similar error: it believed that considering Defendants' contemporaneous data showing across-the-board improvements would require it to "prematurely assess[] the merits of Plaintiffs' case." JA1377.

But Plaintiffs and the district court are wrong in refusing to engage the evidence.  At class certification, "courts should be open to *all* probative evidence." *Goldman Sachs*, 594 U.S. at 122 (cleaned up) (emphasis added).  "That is so regardless whether the evidence is also relevant to a merits question[.]"  *Id.*  "[A] court has an obligation before certifying a class to 'determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits.'"  *Id.* (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)); *see also Wal-Mart*, 564 U.S. at 351 ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.").  So the district court had a duty to probe the evidence—especially because Plaintiffs seek prospective relief.

A genuinely rigorous analysis shows that Plaintiffs still can't establish commonality. As to each purported practice, there's no common policy, no common injury, and no common remedy.

### 1. Caseloads

The district court got it clearly wrong when it found DHS had a "common practice" of maintaining high caseloads. Plaintiffs argue that the district court "rejected" Defendants' evidence as merits-based. Reply Br. 43. But that's the point. Defendants' evidence wasn't *limited* to merits questions. And by wrongly failing to consider a category of evidence altogether, the district court clearly erred. *See United States v. Wooden*, 693 F.3d 440, 454 (4th Cir. 2012) (finding clear error when a district court failed "to at least consider [contrary] evidence, and account for it, when concluding otherwise").

Plaintiffs' evidence shows that Defendants face hiring difficulties, but that reality of the job market doesn't mean Defendants have a policy or well-defined practice of maintaining high caseloads. And had the district court conducted the required rigorous analysis, it would have seen that Defendants made significant hiring and recruiting efforts. *See* Resp. Br. 70. Those efforts rebut a "policy or well-defined practice" of maintaining high caseloads.

Even looking at the limited evidence it considered, the district court erred in determining that "high caseloads" is an appropriate trigger for commonality. Commonality exists when one common answer will "drive resolution" of the case "in one stroke." *Wal-Mart*, 564 U.S. at 350, 358. Determining that *some* caseworkers maintain high caseloads doesn't answer whether *all* class members will experience certainly impending future harm— regardless of whether "high caseloads" could constitute "conscience-shocking behavior" or "deliberate indifference." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998)).

### 2. Array of placements

Plaintiffs argue Defendants "quibble" with the district court's "weighing" of evidence by explaining how an "inadequate array of placements" is no common practice. Reply Br. 44. And here again, Plaintiffs misunderstand—Defendants take issue with the district court's failure to conduct a rigorous analysis of the evidence, which requires engagement with all evidence. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 187 (3d Cir. 2020). The Court can address that failure. *See, e.g., S. Indep. Bank v. Fred's, Inc.*, No. 2:15-CV-799-WKW, 2019 WL 1179396, at *6 n.2 (M.D. Ala. Mar. 13, 2019) (noting "the Supreme Court's apparent weighing of the

evidence in *Wal-Mart*"); *see also United States v. Caporale*, 701 F.3d 128, 140 (4th Cir. 2012) (explaining a district court clearly errs when it "makes findings without properly taking into account substantial evidence to the contrary").

The district court didn't discuss more recent placement-related data from October 2022. It instead relied solely on 2017 data, which was stale by 2023—and especially so when considering forward-looking relief. Other courts have refused to certify classes seeking prospective relief based on stale data. In *Aguilar v. Immigration & Customs Enforcement Division of U.S. Department of Homeland Security*, for example, the plaintiffs sought to represent a proposed class consisting of "Latinos in the New York area who have been, or in the future will be, subject to a home raid operation." No. 07-cv-8224, 2012 WL 1344417, at *5 (S.D.N.Y. Apr. 16, 2012) (cleaned up). The plaintiffs relied in part on a "statistical analysis" of data from 2007. *Id.* at *5-7. While the record supported "common questions regarding whether the defendants' conduct in 2007 was constitutional or otherwise illegal," that was "a separate issue from whether there [wa]s substantial evidence of a pattern and practice raising common questions … in 2012." *Id.* at *8. So the court declined to find commonality "based on conduct occurring five years prior." *Id.* at *9. Like the *Aguilar* plaintiffs, Plaintiffs here asked the district court

to find commonality based on conduct occurring six years prior—and the district court mistakenly agreed.  JA1370-1373.

Even this stale data fails to show commonality.  The district court said that "[i]n 2017, 9% of children in DHHR's custody for less than twelve months experienced three or more placements.  That number jumps to 28% for children in DHHR's custody for twelve to twenty-four months, and to 58% for children in custody longer than twenty-four months."  JA1372 (internal citations omitted).  And finding these outdated statistics sufficient for class treatment, the district court also said "excessive moves result[] in inconsistent psychological care" "[f]or children in treatment," and "frequent placement changes negatively impact foster children's well-being."  JA1372-1373.

This data doesn't establish a common policy of excessive placement changes for a few reasons.

*First*, the district court didn't define "excessive" or "frequent."  The court appears to have selected "three or more" as the line of demarcation—without saying why that's the point at which a constitutional concern arises.  JA1372.  But it didn't say whether three placements are excessive over one year or two or three.  And if that undefined "excessive[ness]" changes over time, then the district court needed to say so.

*Second*, the district court relied on the harm of "inconsistent psychological care," which is limited to "children in treatment." JA1372. But the court didn't determine how many foster children are in treatment. So it couldn't—and didn't—say whether this harm was common to the class. Only 12% of foster children are designated as "emotionally disturbed," JA960, so 88% of the class isn't subject to this "risk of harm."

*Third*, the district court's own figures undermine any finding of commonality. The median time spent in foster care in West Virginia in 2023 was 10.7 months. JA1282. So more than 50% of foster children spend less than one year in the State's custody. Based on the district court's outdated statistics, more than half the class has a 9% "risk" of experiencing three or more placements. An even smaller percentage of the class has a 28% "risk." And an even smaller percentage has a 58% "risk." Even crediting these statistics, it follows that 91% of more than half the class is not at risk; 72% of the undefined percentage of children in care between twelve and twenty-four months are not at risk; and 42% of the undefined percentage of children in care more than two years are not at risk. That's a far cry from "all." To the contrary: these percentages show "[d]issimilarities within the proposed class" that "impede the generation of common answers," *G.T.*, 117 F.4th at 202

(cleaned up)—even if those percentages were sufficient to establish a "substantial risk" of harm. *See Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) (finding 33% chance of identity theft "falls far short of establishing a 'substantial risk' of harm").

*Fourth*, the district court did not address the evidence that Defendants sought to expand the placements (*e.g.*, increased payments, expanding support for kinship placements, re-designing home finding policies, recruitment initiatives). Resp. Br. 13. These efforts belie the notion that Defendants had a "policy" of an "inadequate array of placements." Especially considering those efforts, one cannot assume a "policy" of "inadequate array of placements" just because West Virginia (like nearly all States) was facing a shortage of people volunteering to serve as foster parents.

*Fifth*, Plaintiffs downplay the importance of placement stability altogether. West Virginia was second in the nation in placement stability at class certification. JA1323-1324. But Plaintiffs now insist that children are stuck in placements that are unsafe or unsuitable. Reply Br. 46. No evidence supports that idea. *See* JA1311-1312 (statistics showing West Virginia foster children experience maltreatment at a rate of 0.00251% or, in other words, 99.99749% of West Virginia foster children do not experience maltreatment).

What's more, Plaintiffs say the national averages that West Virginia beats aren't relevant. But the district court specifically relied on outdated national averages to find commonality for the subclass. JA1388.

Plaintiffs have created a Catch-22. If children have multiple placements, West Virginia is harming them. And if children have one placement (as most do), West Virginia is harming them. The ever-changing nature of these "common questions" show they don't offer a common and consistent thread tying the class together. And either way, the answer is fact- and child-dependent—individualized and not capable of resolution in one stroke.

### 3. Case planning

Plaintiffs fare no better rehabilitating their "common" claim of "inadequate case planning." Reply Br. 47-49. Like placement instability, Plaintiffs are no longer trying to fix a lack of permanency. Because the permanency data shows West Virginia has significantly improved—putting it at the top of key performance indicators, JA1315-1320—Plaintiffs now claim that the *real* harm of inadequate case planning is a lack of undefined "services" and "safe and stable homes." Reply Br. 48. So here again, when the data says that the harms Plaintiffs identified aren't prevalent, they have pivoted to a new argument that a different ill-defined "harm" is the *real* problem.

Plaintiffs also try again to downplay the individualized nature of case planning. They can't. Case planning is different for every child—each with their own unique situations, needs, and permanency goals. That's why West Virginia law contemplates "an individualized service plan for a child or family." W. VA. CODE § 49-4-404(a); *see also id.* § 49-4-610. Even Plaintiffs concede the uniqueness of children with disabilities (their subclass), Reply Br. 49, without explaining why this uniqueness disappears as to the rest.

*All* children are unique. And "[e]ach child's claims depend on his or her unique needs and circumstances." *G.T.*, 117 F.4th at 207. This Court has found certification "improper" when claims relied on children's "unique needs." *Id.* In *G.T.*, the plaintiffs filed a putative class action alleging their school district failed to provide students with disabilities "a free [and] appropriate public education." *Id.* at 197. Like case plans for foster children, a free and appropriate public education includes services "tailored to the needs of a particular child." *Id.* Instead of case plans, children in special education receive an "individualized education program" (IEP) that "spells out a personalized plan to meet all of the child's 'educational needs.'" *Id.* at 198. Like multidisciplinary teams in the foster care setting, special education uses IEP teams, "consisting of the child's parents, school officials, and teachers."

*Id.* But when the district court certified a class in these circumstances, this Court reversed. In addition to the lack of a "uniformly applied, official policy" or "an unofficial yet well-defined practice," this Court homed in on the "highly individualized assessment of whether a child was denied" a free and appropriate public education. *Id.* at 205. Because the "class members' claims [we]re highly diverse and individualized" and "based on multiple, disparate failures to comply with" the school district's obligations, "class treatment" was "foreclose[d]." *Id.* at 205-06.

There's little daylight between case plans and IEPs—and thus little daylight between this case and *G.T.* Both are "individualized." *G.T.*, 117 F.4th at 198; W. Va. Code § 49-4-404(a). Both case plans and IEPs determine "services" children need. *G.T.*, 117 F.4th at 197; W. Va. Code § 49-4-404(a). And both are implemented by teams. *G.T.*, 117 F.4th at 198; W. Va. Code § 49-4-404(a). Likewise, Plaintiffs' case planning claims here track the claims concerning IEPs in *G.T.* Both admit that the challenged systems have appropriate policies. JA1455; *G.T.*, 117 F.4th at 201. And both generally assert the respective systems could operate better. But both lack the "glue holding the alleged *reasons* for all those [deficiencies] together." *G.T.*, 117 F.4th at 203 (cleaned up).

### 4. Community-based services

In arguing that the district court appropriately relied on 2015 evidence showing an inadequate array of community-based services, Reply Br. 49, Plaintiffs once more wave off Defendants' contrary arguments as merits issues. Reply Br. 50. Yet it's Plaintiffs who conflate merits and class questions. At the class certification stage, it doesn't matter if some evidence shows that services are inadequate for some class members. What matters is whether Defendants have a *policy or practice* of maintaining an inadequate array. Stale data or sporadic accounts can't show a present policy or practice that still calls for injunctive relief.

And Plaintiffs don't grapple with Defendants' policy. They announce, without support, that they can "prove" a "pattern of failing to comply with official policy." Reply Br. 50. Again, neither Plaintiffs nor the district court says what "pattern" is sufficient for class certification. They don't claim that the array is inadequate for *all* subclass members, nor do they say the array is inadequate for 10% of subclass members. That quantitative question must be answered *before* class certification so the district court can determine whether a "single injunction" can remedy the alleged "risk of harm" in "one stroke."

\* \* \* \*

In short, Plaintiffs still have not identified a common question that drives resolution of the class's claims. The district court thus abused its discretion in certifying the class.

## II. The district court erred in finding typicality.

Even if commonality existed—it doesn't—Plaintiffs cannot satisfy typicality's separate requirement. In insisting otherwise, Plaintiffs and the district court both misunderstand the typicality standard. The district court found—and Plaintiffs repeat—that typicality merely requires the class members to assert the same cause of action. Reply Br. 51-52 (quoting JA1392-1393). That's not enough. A "class representative satisfies the typicality requirement if the claims or defenses of the class and the class representative *arise from the same event or pattern or practice* and are based on the same legal theory." *Carter v. City of Montgomery*, 108 F.4th 1334, 1341 (11th Cir. 2024) (emphasis added) (cleaned up).

"To be given the trust responsibility imposed by Rule 23, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 156 (1982)). In other words, "the named plaintiff's claim and the class

claims [must be] so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* (quoting *Falcon*, 457 U.S. at 157 n.13). So "[t]he representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Id.* And "when the variation in claims strikes at the heart of the respective causes of actions," this Court has "readily denied class certification." *Id.* at 467.

A plaintiff becomes atypical when evaluating his or her harm becomes "dependent upon consideration of the unique circumstances pertinent to each class member." *Boley v. Brown*, 10 F.3d 218, 223 (4th Cir.1993). That's not to say the plaintiffs must be identical, but "material variations" that "emanate from several sources, or do not actually reach the putative class members," are not a "valid [] basis for a class action." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir.1998) (cleaned up) (quoting *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973)). So typicality ultimately turns on "a review of the elements of plaintiffs' prima facie case and the facts on which the plaintiff would necessarily rely to prove it." *Deiter*, 436 F.3d at 467; *see also Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022) ("In evaluating typicality, we focus on

whether the class representatives' legal theory and claim, or the individual circumstances on which those theories and claims are based, are different from those of the class.").

The class here is a "hodgepodge of factually as well as legally different plaintiffs." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). That's not surprising. Plaintiffs assert a class claim for violation of substantive due process rights. And such a claim invariably "demands an exact analysis of circumstances before any abuse of power is condemned." *Lewis*, 523 U.S. at 850. "Deliberate indifference that shocks in one environment may not be so patently egregious in another[.]" *Id.* That's why "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006). A factfinder will need to undertake an individualized inquiry as to each named Plaintiff (and class member) and their claims.

Plaintiffs argue that typicality is met because they assert "risk of harm." Reply Br. 52, but "risk of harm" is not an all-encompassing cure-all. "The Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, but not a broader due process right to appropriate

or effective or reasonable treatment of [] illness or disability[.]" *Elizabeth M.*, 458 F.3d at 788 (citing *Youngberg v. Romeo*, 457 U.S. 307, 316–19 (1982)). So the "harm" must be defined specifically before a court can determine whether a substantive due process right even exists. And individualized inquiry is required to determine whether (1) the defendants' conduct "shocks the conscience" and constitutes "deliberate indifference" and (2) *causes* a deprivation of a constitutional right. *Lewis*, 523 U.S. at 846-50.

Consider Theo S., for example. When Plaintiffs filed their complaint, Theo had allegedly been in numerous placements. JA170-174. After the circuit court terminated his parents' rights, Theo's paternal aunt and uncle were set to adopt him. JA172. But just before adoption, the aunt reneged, saying Theo was "too much" in her home. JA172. So he was placed with his maternal aunt, who demanded he be removed four months later. JA172. He was moved to another relative's home, but that relative also asked to have Theo removed. JA172. The State eventually found a pre-adoptive placement, but that fell through after Theo was "discharged from his fifth daycare and [] attacked his foster mother." JA173. Theo was then taken to a hospital and later discharged to an acute mental health facility. JA173. After discharge, he was placed in a residential treatment facility, which treated him for multiple

mental health disorders.  JA173.  Theo claims that he "has suffered and continues to suffer emotional and psychological harm" because Defendants failed to make "reasonable professional judgments" and failed to "engage[] in reasonable case planning and placement matching."  JA174.

Now consider an absent class member.  If the absent class member had the same history but remained in a stable placement with the paternal aunt and uncle, would there be a claim?  No.  Removing a child from an abusive and neglectful home and placing that child with a family member could hardly "shock the conscience" or constitute "deliberate indifference."  What if the maternal aunt had kept the child in her home?  Or the third relative?  Changing one fact changes the analysis completely, but not class membership.

That disconnect shows individualized inquiry is necessary to prove Plaintiffs' claims.  So they can't satisfy typicality.

### III. The district court erred in finding that a single injunction or declaratory judgment would provide relief to all.

Plaintiffs don't seriously engage with Rule 23(b)(2)'s requirement that "a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart*, 564 U.S. at 360.  Instead, they argue that their claims are related to "civil rights" and "Rule 23(b)(2) is easily satisfied in

civil rights actions." Reply Br. 53. Plaintiffs' reliance on this dictum is misplaced.

While the Court has noted that "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture," *Wal-Mart*, 564 U.S. at 361 (quoting *Amchem*, 521 U.S. at 614), it identified "challenges to racial segregation" as the types of civil rights cases that serve as those "prime examples," *id.* And the Court cited the Advisory Committee's Note listing eight cases—all of which were segregation cases. *Id.* (citing 28 U.S.C. app. at 1260-61). In those cases, the "right of each to some relief will turn upon the resolution of th[e] common question of fact" of whether the schools assigned students to a particular building based on race. *Brunson v. Bd. of Trs. of Sch. Dist. No. 1 of Clarendon Cnty.*, 311 F.2d 107, 109 (4th Cir. 1962). And the complaints did "not present those disparate factual controversies" Plaintiffs' claims present here. *Id.* So a "single injunction" could "provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Indeed, real-world experience bears that out. *See, e.g., Brown v. Bd. of Educ.*, 139 F. Supp. 468, 469 (D. Kan. 1955); *see also Briggs v. Elliott*, 132 F. Supp. 776, 778 (E.D.S.C. 1955); *Allen v. Cnty. Sch. Bd.*, 249 F.2d 462, 464 (4th Cir. 1957).

But while racial segregation is imposed and felt uniformly, Plaintiffs' asserted "practices" produce unpredictable effects that are said to manifest through all sorts of dissimilar means. So it's much harder to imagine what an injunction looks like in Plaintiffs' case. A mandatory injunction requiring "adequate" case plans is meaninglessly broad. And it's too subjective, seeing as how it would require a federal court to dictate "which of several professionally acceptable choices should have been made." *Youngberg*, 457 U.S. at 321 (cleaned up). A mandatory injunction requiring Defendants to add to their arrays of placements or community-based services suffers similar infirmary. The district court didn't determine what types of placements or services were lacking or which children needed something other than what Defendants offered. And to make that determination, the district court would have had to conduct individualized inquiries. No "single injunction" can provide all class members relief in this case. So certification of a Rule 23(b)(2) class was erroneous.

Plaintiffs also forget that *Wal-Mart* itself was a civil rights case. The *Wal-Mart* plaintiffs brought sex discrimination claims under Title VII of the Civil Rights Act of 1964. *Wal-Mart*, 564 U.S. at 343. Even so, the Court found their claims were "improperly certified under" Rule 23(b)(2). *Id.* at 360.

That's because the plaintiffs' claims could not be "remedied by a single classwide order." *Id.* at 361. So civil-rights cases are not immune from an appropriate Rule 23(b)(2) analysis. Whatever the history, Rule 23 "remains nonetheless indispensable[,] [and] [t]he mere fact that a complaint alleges [civil-rights claims] does not in itself ensure that" the rule is satisfied." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977). That's particularly so when, like the *Wal-Mart* plaintiffs, the class members "have little in common but their [status as foster children] and this lawsuit." *Wal-Mart*, 564 U.S. at 360 (cleaned up).

## CONCLUSION

The Court should affirm the district court's dismissal order. But if it does not, it should reverse the district court's class certification order and instruct the district court to decertify the class.

Respectfully submitted,

JOHN B. MCCUSKEY
    ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams
    *Solicitor General*
    *Counsel of Record*

Holly J. Wilson
    *Principal Deputy Solicitor*
    *General*

Caleb B. David
    *Deputy Solicitor General*

Frankie A. Dame
    *Assistant Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov
cdavid@wvago.gov
fdame@wvago.gov

Dated: August 1, 2025

*Counsel for Defendants-*
*Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This reply brief complies with Fed. R. App. P. 28.1(e)(2)(C) because it contains 6,388 words.

2.      This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams